UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ANTWAINE PARKER,

    Petitioner,

                      ORDER
   v.                02-CV-373A

VICTOR HERBERT, Superintendent, Attica
Correctional Facility,

    Respondent.

---

## **INTRODUCTION**

The petitioner, Antwaine Parker, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 on May 21, 2002. Petitioner challenges the constitutionality of his state court conviction for second degree (intentional murder) in violation of N.Y. Penal Law § 125.25(1) and second degree criminal possession of a weapon in violation of N.Y. Penal Law § 265.03.

The matter was referred to United States Magistrate Judge Victor E. Bianchini, for report and recommendation. On May 28, 2009, Magistrate Judge Bianchini issued a report and recommendation recommending that the petition be granted in part and denied in part.

Respondent filed objections to the report and recommendation and the petitioner filed a response thereto. On July 28, 2009, this Court heard oral arguments on the objections.

## BACKGROUND

Very briefly, the petitioner was convicted of shooting an individual named Tyrone Brown on June 14, 1997, in the City of Buffalo. A key witness against the defendant at trial was William Byrd, the victim's cousin. On the day of the shooting, the victim's cousin, Byrd, was driving an $85,000 Mercedes-Benz and the victim was following behind Byrd's vehicle in a rented Dodge Caravan. The Caravan contained $20,000 in cash. During trial, Byrd testified that on the day of the shooting, he saw the petitioner drive past his Mercedes-Benz in a green Cadillac, whereupon the petitioner turned the Cadillac around in the middle of the street, pulled up behind the victim's Caravan, and began shooting. Byrd identified the petitioner as the shooter and stated that he knew the petitioner from the streets. Immediately after the shooting, Byrd gave the keys of the Caravan to a passerby and asked him to move it around the corner. Byrd claims that he did so because he feared the police would take the money. He also claimed that when he returned for the money, he found that the van had been broken into and the money stolen.

It was the defense theory at trial that Byrd, not the petitioner, had murdered the victim. The defendant argued that Byrd and his cousin were drug dealers and that Byrd had contracted for his cousin's murder in order to rob him of the $20,000 cash and to take over the drug distribution business. Although the defendant was permitted to make this argument to the jury, the defendant did not present any evidence or witnesses in support of this theory. Instead, the defendant relied upon inferences based upon: (1) the fact that Byrd was driving an expensive vehicle which he could not afford; and (2) the victim was driving a Caravan containing $20,000 cash. Byrd told the jury that he had borrowed the Mercedes from his car-dealership employer, and that the victim was carrying $20,000 cash because they were on their way to buy a car.

After conviction, it was discovered that the victim was the head of a drug distribution ring, and Byrd, his cousin, was his "right hand man." Despite the fact that state and federal officials were jointly investigating the victim and Byrd for drug trafficking at the time of trial, that information was never disclosed to the petitioner's attorney.[1] Also not disclosed was the fact that state police found a note on the victim's body, which purported to be a list of drug debts owed to the

---

[1] Petitioner's attorney had repeatedly requested that information because he had information indicating that the federal government was investigating Byrd and the victim for drug trafficking. The prosecution denounced defense counsel's representations as a "fishing expedition" and professed repeatedly that there was no such *Brady* information.

3

victim by others, including Byrd. According to the note, Byrd owed the victim $25,000.

In a prior § 440.10 motion, the petitioner argued that the prosecution's failure to disclose the existence of a joint federal-state investigation into the victim's and Byrd's drug activities violated the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995). Following a hearing on that motion, the state court judge issued an order finding that, because "Buffalo police officers were directly involved . . . in the investigation of [the victim] and Mr. Byrd for cocaine trafficking," *see* Decision and Order on § 4401.0 motion, Dkt. 1, Exh. H, at 19, the prosecutor had an obligation to learn of and disclose that exculpatory information to defense counsel. Notwithstanding that failure, however, the state court judge found that even if the existence of the drug trafficking investigation had been disclosed before trial, "it would not have been reasonably possible" for the jury to reach a different verdict.

Importantly, the issue about the drug debt note found on the victim's body was never disclosed to the petitioner and therefore never raised in his § 440.10 motion. It was not until after the instant habeas petition was filed that the petitioner learned of the existence of that note. The petitioner argues that the prosecutor's failure to disclose the existence of that note violated its obligations under *Brady*, and that if that note and all of the other *Brady* evidence that has since come to light had been disclosed at trial, there is a reasonable probability

4

that the verdict would have been different. The petitioner argues that he could have used evidence showing that Byrd and the victim were drug dealers, and the fact that Byrd owed the victim $25,000, to support the defense theory that it was Byrd, not the petitioner, who committed the murder and that Byrd did so in order to wipe out his $25,000 drug debt and take over the victim's drug distribution business.

## **DISCUSSION**

Among the claims raised in his petition, petitioner alleges that the prosecutor's failure to disclose the existence of the drug debt note violated the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, petitioner argues that the note provided exculpatory evidence supporting his claim that Byrd and the victim were engaged in drug trafficking and that Byrd (not petitioner) killed the victim to take over the drug business. Petitioner also argues that the note evidencing that Byrd owed the victim $25,000 provided Byrd with an additional motive. Respondent argues that this Court lacks authority to consider petitioner's claim relating to the drug debt note because that claim was never exhausted in state court.

In *Rose v. Lundy*, 455 U.S. 509 (1982), the Supreme Court held that federal district courts may not adjudicate "mixed petitions" for habeas corpus, that is, petitions containing both exhausted and unexhausted claims. The Court

reasoned that the interests of comity and federalism dictate that state courts must have the first opportunity to decide a petitioner's claims. *Id.* at 518-19. There appears to be no dispute that the petition in this case is a "mixed petition" because it contains both exhausted and unexhausted claims. Specifically, petitioner's *Brady* claim regarding the failure to disclose the drug debt note was never raised in a state court proceeding. This is certainly understandable since the existence of the note was never disclosed to the petitioner, and the petitioner only learned about it after filing this petition. Nevertheless, that claim is unexhausted and under *Lundy*, this Court is prohibited from granting the petition on the basis of that unexhausted claim.

  During oral argument on the objections, the Court inquired as to whether petitioner wanted the note to be considered in connection with his other *Brady* claims. Petitioner's counsel responded affirmatively. However, because petitioner must first raise that claim in state court, the Court finds it appropriate to invoke the "stay and abeyance" procedure endorsed by the Supreme Court in *Rhines v. Weber*, 544 U.S. 269, 275 (2005). Under that procedure, rather than dismissing a mixed petition under *Lundy*, a district court has the discretion to stay the petition and hold it in abeyance while the petitioner exhausts the unexhausted claims. *Id.* Once all of the claims have been fully exhausted, the district court can lift the stay and adjudicate the petition. *Id.* However, to obtain a stay of a mixed petition, the petitioner must show that: (1) there was "good cause" for failing to

exhaust the state remedies; (2) the claims are potentially meritorious; and (3) there is no indication that the petitioner engaged in intentionally dilatory tactics. *Id.* at 278.

The unexhausted claim in this case easily meets the requirements set forth in *Rhines*. Petitioner has shown good cause for failing to raise his *Brady* claim relating to the drug debt note – he was never made aware of that note until after the instant petition was filed. Petitioner should not be faulted for the State's failure to fully discharge its *Brady* obligations - even after the existence of a lengthy § 440.10 hearing in state court.

Second, it would appear that petitioner's claim relating to the drug debt note is potentially meritorious, particularly when considered along with all of the belated *Brady* information. As stated, it was the defense theory that Byrd, not the petitioner, committed the murder by setting up his cousin to be shot so that he (Byrd) could take over the drug business. Although defense counsel was permitted to cross-examine Byrd on the issue of whether he or the victim were drug dealers, Byrd denied that they were, and defense counsel was bound by Byrd's denials. Moreover, during the prosecution's closing, the prosecutor argued to the jury that Byrd was <u>not</u> a drug dealer, even though he has since admitted that he suspected that Byrd was. It is now clear that the victim was the head of a cocaine distribution ring and Byrd was his "right hand man." Petitioner claims that if information about Byrd's drug dealing and the drug debt note found

7

on the victim had been disclosed to the jury, it is possible that the jury would have reached a different verdict.[2]  Because this claim is "potentially meritorious," petitioner has satisfied the second requirement of the *Rhines* "stay and abeyance" test.

As to the third *Rhines* requirement, there has been no indication that the petitioner engaged in intentionally dilatory tactics.  Therefore, this requirement is also satisfied.

Although Magistrate Judge Bianchini recommended that this Court find that the petitioner has fulfilled the exhaustion requirement of § 2254(b)(1) because he was "skeptical as to whether [petitioner] has 'available State corrective process' by which to exhaust the *Brady* claim involving the note," *see* Report and Recommendation, at 63, the Magistrate Judge also indicated that "[petitioner] theoretically could return to County Court and file another § 440.10 motion alleging a *Brady* violation based on the newly-discovered note, and it would not be subject to a procedural bar or statute of limitations under New York state law." *Id.* at 62.  There appears to be nothing precluding the petitioner from presenting

---

[2]  Petitioner argues that disclosure of the drug debt note at trial would have had a "huge impact" on the defense case because the existence of the note would have given the defense specific information concerning individuals who may have had a motive to kill the victim.  It also would have provided petitioner with additional support for his argument that it was Byrd who actually set up the murder in order to wipe out his $25,000 drug debt.  Petitioner argues that suppression of the note unfairly enhanced the State's case because the prosecutor was able to argue without restraint that Byrd was not a drug dealer and had no reason to set up a hit on his cousin.

his *Brady* claim regarding the drug debt note to the state courts at this juncture. Interests comity and federalism dictate that the state court have the opportunity to consider in the first instance whether that there is a reasonable probability that timely disclosure of the note (along with the other belatedly-disclosed *Brady* material) would have produced a different result. Accordingly, the Court finds it prudent to stay the petition and hold it in abeyance pending petitioner's opportunity to exhaust the unexhausted state law claim.

## **CONCLUSION**

For the foregoing reasons, the Court has decided to exercise its discretion to grant the petitioner a stay to return to state court to exhaust his unexhausted claim. This stay is conditioned upon petitioner's prompt initiation of efforts to exhaust the claims in state court–that is, within sixty (60) days of the date he receives a copy of this Decision and Order.

Further, the petitioner must return to this Court within sixty (60) days of the completion of exhaustion proceedings, that is, as soon as he receives a final order from the state court, he must file a motion to lift the stay within sixty (60) days. Failure to comply with the Court's directives may result in vacatur of the stay order.

After the exhaustion proceedings have been completed, the Court will proceed to adjudicate the objections to the Magistrate Judge's Report and Recommendation.

SO ORDERED.

*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

DATED: September 11, 2009